IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| TODRICK MORRIS, #0854732 | § | |
| VS. | § | CIVIL ACTION NO. 6:21cv440 |
| SULEIMAN ALIU, ET AL. | § | |

<u>REPORT AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE</u>

Plaintiff Todrick Morris, a prisoner confined at the Michael Unit within the Texas Department of Criminal Justice (TDCJ), proceeding *pro se* and *in forma pauperis*, filed this civil rights lawsuit complaining of alleged violations of his constitutional rights. The case was referred to the undersigned United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

The present Report concerns only Defendants' motion for summary judgment, (Dkt. #38), limited to the exhaustion of administrative remedies. For reasons explained below, the Court recommends that the motion be denied.

**I. Morris's Amended Complaint**

Morris's amended complaint, (Dkt. #9), is the operative pleading in this lawsuit. An amended complaint entirely supersedes and takes the place of the original complaint. *See Clark v. Tarrant Cnty.*, 798 F.2d 736 (5th Cir. 1986). He explains that on August 22, 2021, at approximately 10:30 pm at the Coffield Unit's restricted housing block, Defendant Enabulele was "feeding/passing [] the dinner meal" at his cell. Morris explains that he "unaggressively [sic] placed his right arm/hand on the already open (unsecured because it was broken) trayslot/foodslot and began to calmly inquire to Officer Enabulele who[] was standing behind a sliding shield" why

1

he was being fed a regular meal containing beans and legumes despite an allergy, (Dkt. #9, pg. 4). He also asked why he was not receiving a shower.

Morris claims that Enabulele became agitated and started cursing and threatening him by "stating that he was tired of me complaining and that he gonna teach me a lesson and teach me to keep my mouth shut." *Id*. at pg. 5. The officer then removed his chemical agent canister from his waistline and "motioned as if he was going to spay [Morris] while [Morris] was not being aggressive or threatening at all." *Id*. Morris asserts that after ten minutes "of these actions," Defendants Aliu and Nosegbe arrived on L-wing "and stood in between the shower at the front of the wing and my cell (L-105) while Officer Enabulele was still standing behind the shield in front of my cell." *Id*. Enabulele, with Aliu and Nosegbe looking on, walked from behind the shield to the front of his cell and opened the foodslot—while his right arm/hand remained still on the slot.

With a large steel or metal tray carrier in his hands, Morris states, Enabulele began yelling and screaming. Enabulele then hit him on his right arm/hand three times with the large steel carrier, causing excruciating pain in his entire right arm. Morris explains that he temporarily "went into shock" and was therefore unable to move. *Id*. Aliu then arrived at the cell and assisted Enabulele "in striking [him] on [his] right arm/hand one more time with the large steel tray carrier" while Nosegbe looked on. *Id*.

Aliu and Enabulele then walked to the front of the wing by the shower where Nosegbe was standing. Nosegbe then walked to Morris's cell and started kicking the open slot on his door yelling "we told you," before walking away. All three officers then left the wing "without even initiating the I.C.S. (Incident Command System)." *Id*.

Morris further explains that he managed to pull his right arm/hand off the slot inside his cell—revealing a hand that was bleeding profusely. *Id*. at pg. 5. He began yelling out for medical

attention to the desk officer while trying to stop the bleeding, to no avail. Morris asserts that he continued bleeding inside his cell in severe pain for thirty minutes. Captain Turney came to his cell, looked inside, witnessed puddles of blood on the floor, and noticed his right hand/arm was bleeding. Morris then explained to Turney what occurred—that he had been assaulted by Aliu and Enabulele with a carrier and needed medical attention. *Id*. at pg. 6. Turney, however, "just walked away" and left the wing. Morris states that he remained bleeding in his cell for one hour and a half. *Id*.

Captain Turney arrived back at Morris's cell with Lieutenant Tieman and Officer Aiayi. Morris explains that when he arrived at the infirmary, he was assessed on video camera by Nurse Fields; Morris "personally notified and showed" her that he sustained injuries to his right arm and hand. Fields examined the injuries to his right arm and hand—and briefed the video camera of the injuries that included lacerations to his right elbow, right index finger, and middle fingers "with swelling." *Id*. The medical provider gave prison officials orders to take Morris to the local hospital.

While at the Palestine Regional Medical Center, Morris was examined and sutures were placed in his right middle and index fingers. *Id*. at pg. 6. X-rays were ordered—revealing fractures in his right middle and index fingers, which were then placed in a splint. *Id*. Morris was scheduled to see a hand specialist or a plastic surgeon at Hospital Galveston for further evaluation. On August 31, 2021, Morris was examined and the specialist determined that he "needed surgery to repair [his] fingers." *Id*. at pg. 6. The following day, September 1, 2021, reconstructive surgery was performed on his right fingers and surgical pins were place inside the middle finger. *Id*. Morris insists that he now has "permanent deformities to [his] right hand/fingers as well as a severe loss of range of motion/bending to [his] right middle and index fingers." *Id*. at pg. 7.

Morris explains that he submitted a Step One grievance, number 2021155577, on August 26, 2021. Prison officials at the Coffield Unit confirmed receipt of the grievance; however, that Step 1 grievance was never returned to him. *Id*. Morris notes that he wrote the Coffield and Allred Unit's grievance departments requesting the status of his grievance "and they frivolously respond[ed] stating that it's still being investigated despite the investigating period being over." *Id*. at pg. 7. He then "personally notified" the departments that "refusing to return this grievance to [him] will deny [him] the opportunity to submit a Step 2 to no avail." *Id*. Morris seeks compensatory damages, punitive damages, court costs, and a declaratory relief.

## II. Defendants' Motion for Summary Judgment

Defendants Aliu, Enebulele, and Nosegbe move, (Dkt. #38), for summary judgment based on the exhaustion of administrative remedies. Defendants maintain that Morris filed this lawsuit before the grievance procedure was completed. Specifically, they contend that Morris only submitted a Step One grievance to prison officials before initiating this case. Accordingly, they urge this Court to dismiss Morris's lawsuit for the failure to exhaust administrative remedies.

## III. Morris's Response

Morris filed a response, (Dkt. #45), in opposition to Defendants' motion for summary judgment. He argues that the grievance process was "unavailable" to him because prison officials failed to return his Step One grievance. Morris highlights that he initiated this lawsuit on or before November 10, 2021. He explains that TDCJ has a two-step process for grievances; prisoners are to file a Step One formal grievance to the unit's grievance department within fifteen days of the incident for which the prisoner complains. *Id*. at pg. 3.

Once a prisoner files a Step One grievance, the department "shall have" forty days to investigate the grievance and return the Step One grievance with a response to the prisoner. *Id*. If

a prisoner is dissatisfied with the response, he "shall have" fifteen days from the date of the answered Step One grievance in which to file a Step Two grievance appeal. *Id*. at pg. 4. The answered Step One grievance must be attached to the Step Two grievance appeal and submitted to the grievance department for review. *Id*. Morris states that if a prisoner does not possess the answered Step One grievance attached to the Step Two grievance appeal, the prisoner cannot submit a Step Two appeal. Prison officials then return both the answered Step One and the answered Step Two appeal to the prisoner. *Id*.

Morris maintains that he submitted his Step One grievance, number 2021155577, on August 25, 2021, to prison officials concerning the food slot incident. *Id*. at pg. 4. According to TDCJ policy, he argues, the grievance department then had forty days—or until October 4, 2021—in which to investigate, answer, and return the Step One grievance. He insists, however, that prison officials did not return his Step One grievance and did not notify him of any extension of time on or about October 4, 2021. *Id*. at pg. 5. Morris then submitted a written request to the Coffield Unit's grievance department on October 17, 2021, explaining that "it had been over 40 days and that he had not been given notice of any type of extension" and therefore requested the status of his grievance. A few days later, prison officials returned this written request to Morris unsigned—with a response stating "it is still being investigated." *Id*. Morris continued submitting more requests to prison officials inquiring about his Step One grievance.

On November 5, 2021, Morris was transferred to the Allred Unit. *Id*. at pg. 6. He remained without his Step One grievance. Morris sent another written request to the Allred Unit's grievance department on November 7, 2021, to notify the department of the issue and requesting that the Step One grievance be returned to him so that he could submit a timely Step Two grievance appeal. The written request was returned to Morris "a few days later" stating that "once the investigation

is complete they (Coffield Unit) will forward it to the Allred Unit Grievance Dept." *Id*. at pg. 6. Morris then sent several more requests—which went unanswered.

After waiting several more days, Morris then submitted a new Step One grievance, number 2022035064, to the Allred Unit's department concerning the failure to return his Step One grievance on November 30, 221. He argued that prison officials at the Coffield Unit were refusing to respond to his grievance, rendering him unable to file a Step Two appeal. *Id*. at pg. 7.

Morris further explains that prison officials finally returned the Step One grievance, number 2021155577, to him at the Allred Unit on January 4, 2022. *Id*. The response noted that "a copy of" his allegations was forwarded to the Office of Inspector General (OIG). Morris submitted the Step Two grievance appeal on January 5, 2022, by submitting both the answered Step One and his Step Two appeal to prison officials. *Id*.

Two days later, prison officials returned the Step One grievance, number 2022035064, to Morris concerning the refusal of the Coffield Unit official's failure to return the separate Step One grievance related to the food slot incident. The Warden explained in the response that "there was a delay in completing Step 1 grievance number 2021155577 due to circumstances beyond the control of the Coffield Unit Grievance office." *Id*. at pg. 7. Morris explains that he received a response to the Step Two appeal on March 3, 2022. *Id*. at pg. 8. He insists that he exhausted all administrative remedies that were available to him under the Prison Litigation Reform Act, and that he had nothing to appeal because his Step One was never returned to him.

## IV. Summary Judgment Evidence

Defendants attached two exhibits in support of their motion for summary judgment:

**Exhibit A:** Relevant grievance records relating to Todrick Morris, TDCJ #0854732, with supporting business records affidavit (Bates Nos. Morris 001 – 006).

>  **Exhibit B:** Relevant portions of the TDCJ Offender Orientation Handbook, [eff. 2017] (Bates Nos. Morris 001-005).

Dkt. #38. Morris attached submitted grievances, numbers 2021155577 and 2022035064, to his response, (Dkt. #45).

>  1. Grievance Number 2021155577

The summary judgment evidence reveals that Morris submitted this Step One grievance, number 2021155577, on August 25, 2021 at the Coffield Unit, (Dkt. #38, pg. 12). In this grievance, Morris described an incident at the began on August 22, 2021, within cell number L-105. He states that at approximately 9:30 pm, at L-05 cell, Defendants Aliu, Enebulele, and Nosegbe assaulted him with a weapon—a "metal/steal tray carrier by intentionally slamming the tray carrier onto [his] right arm and hand several times while [his] arm/hand was laying on [his] food slot." *Id*. Morris further noted that Nosegbe "kicked [his] right hand arm following the tray carrier assault." *Id*. He highlights that he sustained serious injuries to his right arm/hand, including factures and injuries requiring sutures.

Moreover, Morris stated that he was then left inside his cell while bleeding. *Id*. He was also in severe pain for hours before being taken to the medical department and then to the hospital. Morris explains that Captain Turney verified that video surveillance showed that he was attacked/assaulted with a tray carrier. *Id*.

The evidence illustrates that Warden Lane provided a response to this Step One grievance, dating the response as December 16, 2021, (Dkt. #38, pg. 12). Warden Lane explained as follows:

> There was a documented use of force in this incident. All reported uses of force are reviewed by designated use of force staff and will not be addressed through the grievance procedure. A copy of your allegations has been forwarded to the Region II Grievance Officer for coordination with the Office of the Inspector General (OIG). Further investigation is at the discretion of the OIG.

Dkt. #38, pg. 12. The Step One grievance includes a stamp within the "Date Retd to Offender" of December 17, 2021, which is crossed out, and two additional stamps of January 4, 2022:

[Image of Step 1 Offender Grievance Form showing: Grievance # 2021155577, Date Received 8/27/2021, Date Due 10/06/2021, Grievance Code 800, Offender Name Jadrick Morris, TDCJ # 814732, Unit CO, Extension Date 11.15.2021, Date Retd to Offender JAN 04 2022, Received at JA: JAN 04 2022, 12F-76]

*Id.* The "Office Use Only" section also includes an extension date of November 15, 2021.

Morris submitted a Step Two appeal on January 4, 2022. *Id.* at pg. 13-14. He asserted that the Step One response was "a general answer that purports review but doesn't give actual redress," and asks for the findings of the investigation. *Id.* He also complained that the grievance department "intentionally held [his] Step 1 grievance" after the due dates, and that he was never given notice of an extension. *Id.* at pg. 13. Prison officials responded on January 22, 2022, by explaining that the issue was reviewed by the OIG, and the office determined that there was insufficient evidence to warrant opening a case and that "no further action will be taken." *Id.* at pg. 14.

    2. Grievance Number 2022035064

Morris submitted this grievance in his response to the motion for summary judgment. In this Step One grievance, submitted while he was confined at the Coffield Unit on November 29, 2021. Prison officials noted that they received the grievance on November 30, 2021, (Dkt. #45, pg. 22. Morris explained that he "was just made aware" through a letter from Officer Riley that the grievance investigators are "intentionally/knowingly sabotaging evidence as well as obstructing [his] litigation" because they have "ignored/disregarded" all of TDCJ's policies

8

concerning prison grievances and "refused to properly and/or timely investigate" his Step One grievance in grievance number 2021155577 and return it to him. *Id*. He stated that he is therefore unable to file a Step Two grievance if necessary. *Id*. On December 27, 2021, Warden Lane responded as follows:

> All grievances submitted to the Coffield Unit's Grievance Department are processed in accordance with policies and procedures and established guidelines as well as the Offender Grievance Manual. There was a delay in completing grievance 2021155577 due to circumstances beyond the control of the grievance office. The Coffield unit grievance staff is not sabotaging any evidence. Grievance number 2021155577 was returned to you on 12/17/21/ No further action is warranted.

Dkt. #45. pg. 23. Morris filed a Step Two appeal of this grievance on January 9, 2022.

3. November 2021 Letters to the Grievance Supervisor

Morris attached a November 2021 letter he sent to the Grievance Department. He stated that it has been over forty days since he submitted his Step One grievance, number 2021155577, and that he has not received an answer or an extension. The request and response read as follows:

> Case 6:21-cv-00440-JCB-KNM   Document 45-1   Filed 05/02/22   Page 20 of 23 PageID #: 217
>
> To: Grievance Dept/Supervisor
>
> Can you please tell me what the status is of my Step 1 Grievance #2021155577. It has been over 40 days and I "HAVE NOT" received any answer or any extension. Can you please locate it and send/forward it to me ASAP so that time limits about expire (It is still being Investigated)
>
> \* Return Ans-r Requested \*
>
> clc's
> 1) File
>
> Todrick Morris   #854732
> G-122
>
> Thank You.
> cw

9

Dkt. #45, pg. 33. Morris attached another November 2021 letter to Ms. Cooke, Grievance Supervisor, inquiring about the response delay for his Step One grievance in number 2021155577. The letter and the response read as follows:



Dkt. #45. pg. 35.

**V. Legal Standards**

A court shall grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. In determining whether there is a genuine dispute of a material fact, the court must examine the evidence and inferences drawn therefrom in the light most favorable to the nonmoving party. *See S.E.C. v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1994). Summary judgment is appropriate "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (internal citations omitted).

The United States Court of Appeals for the Fifth Circuit has held that summary judgment disposition is inappropriate if the evidence before the court, viewed as a whole, could lead to different factual findings and conclusions. *See Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987). It is not the function of the trial judge—in ruling on a motion for summary judgment—to weigh the evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence. *Id*. at 567 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)).

## VI. Discussion and Analysis

A review of the summary judgment evidence, viewed in the light most favorable to Morris, demonstrates that the evidence before the Court could lead to different factual findings and conclusions. Because there are genuine issues of material fact concerning whether administrative remedies were available to Morris, Defendants' motion should be denied.

It is well-settled that prisoners must exhaust any and all administrative remedies before proceeding in federal court. *See Gonzalez v. Seal*, 702 F.3d 785, 787 (5th Cir. 2012) (explaining that pre-filing exhaustion is both mandatory and non-discretionary). Congress enacted the Prison Litigation Reform Act ("PLRA") in 1996, which mandated that no action shall be brought by a prisoner "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

The purpose of the prison exhaustion requirement is to "provide administrators with a fair opportunity under the circumstances to address the problem that will later form the basis of the suit." *See Bisby v. Garza*, 342 F. App'x 969, 971 (5th Cir. 2009); *see also Patterson v. Stanley*, 547 F. App'x 510, 511 (5th Cir. 2013) (explaining that the primary purpose of a grievance is to give prison officials fair opportunity to address the problem that will later form the basis of the lawsuit); *Johnson v. Johnson*, 385 F.3d 503, 516 (5th Cir. 2004) (interpreting the exhaustion

requirement in light of its purpose, which "include the goal of giving officials time and opportunity to address complaints internally.") (internal quotations and citation omitted).

The exhaustion provision was unanimously upheld by the Supreme Court in *Booth v. Churner*, 532 U.S. 731 (2001). The Court subsequently held that exhaustion is mandatory and that the requirement will not be excused when an inmate fails to properly exhaust his administrative remedies. *Woodford v. Ngo*, 548 U.S. 81, 84 (2006). Proper exhaustion means that an inmate must not only pursue all available avenues of relief but must also comply with all administrative deadlines and procedural rules. *Id.* at 90-91. The Fifth Circuit recently reiterated the principle that "[p]re-filing exhaustion is mandatory, and the case must be dismissed if available administrative remedies were not exhausted." *Gonzalez v. Seal*, 702 F.3d 785, 788 (5th Cir. 2012).

The United States Supreme Court elaborated further about the exhaustion requirement in *Jones v. Bock*, 549 U.S. 199 (2007). It was noted that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Id.* at 211. It was added, however, that the "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specifically plead or demonstrate exhaustion in their complaints." *Id.* at 216. In light of *Jones v. Bock*, the Fifth Circuit provided guidance concerning how the exhaustion question should be handled in *Dillon v. Rogers*, 596 F.3d 260 (5th Cir. 2010). The following procedures were outlined:

> As a final matter, we now provide a brief summary of how district courts should approach exhaustion questions under the PLRA. When the defendant raises exhaustion as an affirmative defense, the judge should usually resolve disputes concerning exhaustion prior to allowing the case to proceed on the merits. If the plaintiff survives summary judgment on exhaustion, the judge may resolve disputed facts concerning exhaustion, holding an evidentiary hearing if necessary.

*Id.* at 272-73.

TDCJ provides a two-step procedure for processing prisoner grievances. *See Johnson*, 385 F.3d at 515-16. A TDCJ prisoner must properly complete both the Step One grievance and the Step 2 appeal grievance in order to properly and fully exhaust his required administrative remedies. *See Wright v. Hollingsworth*, 260 F.3d 357, 358 (5th Cir. 2001). A Texas prisoner must pursue a grievance through both steps to satisfy the exhaustion requirement and mere substantial compliance is insufficient. *Dillon*, 596 F.3d at 268. The prisoner handbook, which is provided to all TDCJ prisoners and is easily accessible, provides that a prisoner must attach his completed Step One grievance—the original, with the prison's response—to the Step Two grievance appeal when submitting a Step Two grievance. *See* Dkt. #38, pg. 18. The instructions specifically provide that "Step 2 appeals shall be accompanied by the original, answered Step 1." *Id*.

When the relevant administrative procedure lacks the authority or ability to provide relief or to take any action whatsoever in response to the grievance, administrative remedies are unavailable—thereby rendering the exhaustion requirement futile. *See Huskey v. Jones,* 45 F.4th 827, 831 (5th Cir. 2022); *Allard v. Anderson*, 260 F. App'x 711, 715 (5th Cir. 2007) (unpublished). The Supreme Court has held that a prisoner is required to exhaust "only those[] grievances that are 'capable of use' to obtain some relief for the action complained of.'" *See Ross v. Blake*, 578 U.S. 632, 642 (2016). Three circumstances under which "an administrative remedy, although officially on the books, is not capable of use to obtain relief" include "where (1) the prison officials are unable or consistently unwilling to provide any relief to aggrieved inmates, (2) the administrative scheme is so opaque that it becomes, practically speaking, incapable of use by an ordinary prisoner, or (3) prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Huskey*, 45 F.4th at 831 (citing *Hinton v. Martin*, 742 F. App'x 14, 15 (5th Cir. 2018) (internal quotations omitted)).

Here, the summary judgment evidence reveals that questions remain concerning whether administrative remedies were available to Morris. Genuine issues of material fact therefore exist—precluding summary judgment at this time.

Morris submitted his Step One grievance to prison officials at the Coffield Unit on August 25, 2021—three days after the food slot incident. (Dkt. #38, pg. 12; Dkt. #45, pg. 18). Officials stamped the grievance as received on August 27, 2021—and included a due date of October 6, 2021. *Id*. While prison officials subsequently stamped an extension date of November 15, 2021, Morris contends that he never received an extension of time—and the record is devoid of any further notice of an extension. The TDCJ prisoner handbook provides that "[a]dditional time may be required in order to conduct an investigation at either the Step 1 or Step 2 and in either case, you shall be notified of the extension in writing," (Dkt. #38, pg. 19). The handbook does not clarify what constitutes "notification of the extension in writing."

The record reflects that Morris initiated this lawsuit on or about November 10, 2021. Morris explained in his initial complaint that the response to his Step One grievance was being "located." After finally receiving a response to his Step One grievance on January 4, 2022, Morris claims he submitted his Step Two appeal on the same day, (Dkt. #45, pg. 16). Accordingly, the record reflects that Morris filed this lawsuit before receiving an official response to his Step One grievance.

Traditionally, the Court's inquiry would end here. Morris initiated this lawsuit before the receiving a response to his Step One grievance. He, however, claims that the Grievance Department at the Coffield Unit intentionally thwarted the grievance process by failing to return the Step One grievance—prompting him to file this lawsuit well after the forty-day period elapsed in which prison officials had to process and return his grievance. He claims that he cannot submit

14

a Step Two grievance until and unless he receives a response to the Step One because he must attach the completed, answered Step One grievance to the Step Two grievance for it to be considered. TDCJ's own procedures support Morris's contention, (Dkt. #38, pg. 18). Accordingly, then, if a TDCJ prisoner never receives an answered Step One grievance, he cannot file a Step Two grievance appeal—and administrative remedies are arguably unavailable.

A similar situation occurred in *Cantwell v. Sterling*, 788 F.3d 507 (5th Cir. 2015). Cantwell, a Texas prisoner, filed a federal lawsuit claiming that prison officials were deliberately indifferent to his serious medical needs. 788 F.3d at 508. Defendants moved for summary judgment based on the failure to exhaust administrative remedies. Cantwell argued he submitted a Step One grievance but never received a response—and therefore never proceeded to the second step in the grievance procedure. The district court granted the motion for summary judgment, determining that Cantwell's claim was "nothing more than a conclusory or unsupported assertion." *Id*. at 510 n.2.

The Fifth Circuit reversed the district court. The Fifth Circuit explained that "the ordinary rules of civil procedure are applicable in prisoner suits. Cantwell offered his testimony under penalty of perjury and declared it to be true and correct, so it must be credited on summary judgment." *Cantwell*, 788 F.3d at 509 n.1. The Court elaborated by citing *Wilson*, 776 F.3d at 301. Highlighting that *Wilson* involved a prisoner's contention that the prison's failure to respond to his initial grievance excused him from additional steps, the Court explained that in certain circumstances, a prison's failure to respond to a grievance may result remedies deemed exhausted.

In *Wilson*, the applicable grievance procedures provided that if a prisoner does not receive a response to his grievance, the prisoner is "entitled" to—and therefore, in order to exhaust, must— "move on to the next step in the process." *Id*. By contrast, the Fifth Circuit explained, in *Underwood v. Wilson*, 151 F.3d 292 (5th Cir. 1998), *overruled on other grounds as explained in*

15

*Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012), it held that when a prison's grievance procedures outline deadlines by which prison officials must respond to grievances—and do not set out any additional steps prisoners must take upon that time elapsing—then "prisoners in such circumstances have exhausted the available procedures." *Cantwell*, 788 F.3d at 510 n.2.

Similarly, here, Morris maintains that prison officials failed to return his Step One grievance. The evidence shows that the applicable grievance provides that prison officials shall return processed Step One grievances within forty days after receipt absent an extension. Morris contends—and Defendants do not dispute—that he never received notice of an extension. As in *Cantwell*, the applicable procedures provided on summary judgment do not set out any additional steps a TDCJ prisoner must pursue upon that time elapsing. *See Cowart*, 837 F.3d at 452 ("Here, unlike in *Wilson*, the policies afforded Cowart no next step once the response period for an interim reply had lapsed, but pending his receipt of a written answer with findings.").

Furthermore, Morris attached his letters to prison officials, dated early November 2021, inquiring about a response to his Step One grievance. While prison officials responded that his complaints were being investigated and that they placed "an extension on the grievance," the summary judgment evidence is devoid of a notice of an extension. Morris claims he did not receive notice of an extension and filed this lawsuit on November 10, 2021—approximately 71 days after he submitted his Step One grievance to prison officials, but without receiving a response. His letters demonstrate that a genuine issue of material fact exists concerning whether administrative remedies were available to him. *See Cowart v. Erwin*, 837 F.3d 444, 452 (5th Cir. 2016) (holding that without a decision on a timely-filed Step One grievance, there is no next step to which the inmate could advance); *Stewart v. Smith*, 2018 WL 3966280, at *5 (W.D. Tex. Aug. 17, 2018)

("TDCJ's grievance process here, in contrast, unequivocally required Stewart to submit his original Step 1 grievance with his Step 2 grievance.").

Defendants' failure to brief—and respond to Morris's summary judgment evidence—supports denying their motion for summary judgment. It is well-settled that the failure to exhaust is an affirmative defense on which Defendants bear the burden of proof. *Jones*, 549 U.S. at 216; *Dillon*, 596 F.3d at 266 (noting that prison officials "must establish beyond peradventure all of the essential elements of the defense of exhaustion"); *Fobbs v. Davis*, 515 F. App'x 330, 331 (5th Cir. 2013) (unpublished) ("We have routinely treated failure to exhaust administrative remedies in this context as an ordinary affirmative defense where the burden is on the prison officials to establish beyond peradventure all of the essential elements of the defense of exhaustion to warrant summary judgment.").

Here, Defendants' motion for summary judgment is silent on the issue of whether administrative remedies were available to Morris. Defendants merely argue that Morris submitted his Step Two grievance appeal after filing this lawsuit and that ignorance of the prison's rules cannot excuse mandatory exhaustion. The summary judgment evidence does not support Defendants' contentions that Morris may not have understood the grievance process. Moreover, they neither address the "unavailability" doctrine nor Morris's multiple attempts to receive an answer to his Step One.

The record reflects, however, that Morris waited 71 days after he submitted his Step One grievance before filing this lawsuit because he never received a response—despite the TDCJ handbook providing that responses are due within 40 days absent notice of an extension. The summary judgment evidence includes Morris's letters inquiring about the status of a response to his Step One grievance. As the Fifth Circuit explained, because Morris offered these claims under

17

penalty of perjury and declared his claims and evidence to be true and correct, his testimony is credited on summary judgment. *Cantwell*, 788 F.3d at 510 n.2.

Given Defendants' failure to respond to Morris's response to their motion and failure to address his summary judgment evidence, Defendants failed to carry their burden beyond peradventure. Consequently, this Court cannot conclude—as a matter of law—that Defendants are entitled to enjoy the benefits of this affirmative defense. *See Dillon*, 596 F.3d at 272-73 (explaining how district courts should generally approach exhaustion questions under the PLRA). Accordingly, Defendants' motion for summary judgment limited to exhaustion should be denied. *See Cantwell*, 788 F.3d at 509 ("The defendants had the burden to establish that there were available procedures that Cantwell did not exhaust, and the district court erred in not holding them to it.").

## VII. Conclusion

While the PLRA requires that prisoners exhaust all administrative remedies before filing their federal lawsuit, the PLRA does not require exhaustion on issues where relief is unavailable. Under the facts and opposing evidence in this case, a genuine issue of material fact exists concerning whether administrative remedies were available to Morris.

## RECOMMENDATION

For the foregoing reasons, it is recommended that Defendants' motion for summary judgment, (Dkt. #38), be denied. Plaintiff Morris's claims should proceed before the Court.

Within fourteen (14) days after receipt of the Magistrate Judge's Report, any party may serve and file written objections to the findings and recommendations contained in the Report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy

shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto Ass'n.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

So ORDERED and SIGNED this 8th day of January, 2023.

_____
K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE